**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| UNIVERSITY OF NOTRE DAME, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **3:13-cv-01276-PPS** |
| | ) | |
| KATHLEEN SEBELIUS, in her official | ) | |
| capacity as Secretary, United States | ) | |
| Department of Health and Human Services, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Notre Dame seeks a preliminary injunction against enforcement of the part of the

Affordable Care Act that requires employers to provide employees with health insurance that

covers contraceptive services. Notre Dame objects to providing contraceptive care on religious

grounds, and that of course is its prerogative. But the law provides religious employers like

Notre Dame an out by allowing it to file a certification saying it refuses to provide such services.

If Notre Dame takes that tack, someone else provides the coverage, and not on Notre Dame's

dime.  Notre Dame nonetheless claims that by formally opting out, it would trigger, or authorize,

a third party's provision of contraception, and it objects to that.

Notre Dame wants to eat its cake, and have it still, at the expense of Congress,

administrative agencies, and the employees who will be affected.  Notre Dame is free to opt out

of providing the coverage itself, but it can't stop anyone else from providing it.  But that is

essentially what Notre Dame is requesting.  Notre Dame is not being asked to do or say anything

it doesn't already do, and wouldn't do regardless of the outcome of this case; the only thing that

changes under the healthcare law is the actions of third parties. Notre Dame can't claim to be "pressured" to do something it has done, will do, and would do regardless of the contraception requirement.  If Notre Dame opts out of providing contraceptive coverage, as it always has and likely would going forward, it is *the government* who will authorize the third party to pay for contraception. The government isn't violating Notre Dame's right to free exercise of religion by letting it opt out, or by arranging for third party contraception coverage.

For these reasons and as outlined more fully below, because I find that Notre Dame is not likely to succeed on the merits, a preliminary injunction is not warranted.

## FACTUAL and LEGAL BACKGROUND

Notre Dame is a nonprofit Catholic university, and the largest employer in St. Joseph County, Indiana. Compl. ¶¶ 9, 21, 24. Notre Dame views its Catholic faith as integral to its educational mission. *Id.* ¶¶ 27-29. It adheres to the Catholic Church's document governing Catholic universities, known as *Ex Corde Ecclesiae*. Affidavit of John Affleck-Graves ¶ 12. It subscribes to the Catholic beliefs "that life begins at conception and that artificial interference with life and conception is immoral."  And so it opposes any artificial impediment to conception. Memo. ISO Motion for Preliminary Injunction at 1; Compl. ¶¶ 32-33. Notre Dame is therefore opposed to "pay[ing] for, [facilitate[ing] access to, and/or becom[ing] entangled in the provision of products, services, practices and speech" that propound contraception. Memo. ISO Motion for Preliminary Injunction at 1. It also believes that it must avoid giving anyone the impression that it condones the use of contraception, which would constitute "scandal," defined as "encouraging by words or example other persons to engage in wrongdoing." Compl. ¶ 34.

Notre Dame's employee healthcare is self-insured, meaning that Notre Dame underwrites its employees' medical expenses itself. Although Notre Dame is financially responsible, it contracts with a third party administrator (a "TPA") to administer the health plan. *Id.* ¶¶ 36-37. Notre Dame offers its students the option of purchasing health insurance through Aetna. *Id.* ¶ 39. Neither plan covers contraceptive services due to Notre Dame's religious objections. *Id.* ¶ 41.

### 1.     Background on the Affordable Care Act

Congress enacted the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (2010) (the "ACA") in 2010, substantially overhauling the nation's healthcare legal and regulatory framework. The ACA requires health insurance to cover certain preventive services without cost to the insured. 42 U.S.C. § 300gg-13. Insurance plans that don't include the required coverage face stiff penalties: $100 per affected individual per day of noncompliance, 26 U.S.C. § 4980D(a), (b), or $2,000 per year per employee if an employer who is required to provide insurance decides not to, 26 U.S.C. § 4980H(a), (c)(1). But certain healthcare plans are grandfathered, which essentially means that if they remain as they were before the ACA was enacted, they don't have to comply with the preventive services requirements. *See* 42 U.S.C. § 18011(a)(2). It is undisputed that Notre Dame's plan isn't grandfathered. Compl. ¶ 42.

Initially, the preventive care coverage requirements did not include various services specific to women's needs. *See* 155 CONG. REC. S11985, S11986 (daily ed. Nov. 30, 2009) (statement of Sen. Mikulski).  But the ACA was later amended to add preventive care specific to women. § 2713(a)(4), 124 Stat. at 131 (codified at 42 U.S.C. § 300gg-13(a)(4)). The law doesn't list the specifics, instead leaving that to "comprehensive guidelines supported by the Health Resources and Services Administration." *Id.*

The problem was that there weren't guidelines for preventive care and screening for women, so the Department of Health and Human Services asked the Institute of Medicine ("IOM") to make recommendations. Inst. of Med., Committee on Preventive Services for Women, CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS, 2 (2011), available at http://www.nap.edu/catalog.php?record_id=13181. The IOM convened a committee of specialists that recommended that the guidelines include support and counseling addressing a battery of issues including, of primary relevance here, "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." *Id.* at 10. (This is the requirement Notre Dame opposes, and for the sake of convenience I will refer to the requirement using the shorthand "contraception" or "contraceptive.")  These approved methods include options that are prescription-only (oral contraceptives and intrauterine devices) and non-prescription (condoms, spermicides and emergency contraceptives). *Id.* at 105. The government adopted guidelines consistent with the IOM's recommendations on an interim basis in 2011, albeit subject to an exemption for religious employers. *See* 76 Fed. Reg. 46,621 (Dep'ts of Treas., Labor, Health & Human Svcs. Aug. 3, 2011).

**2.      Rulemaking Under the ACA**

The adoption of guidelines with a narrow religious exemption was perhaps the moment that the contours of this controversy began to take shape. An organization qualified for exemption from the contraception requirement as a religious employer if: (1) its purpose was the inculcation of religious values; (2) it primarily employed people who shared its religious tenets; (3) it primarily served people who shares its religious tenets; *and* (4) it was a nonprofit under

4

sections 6033(a)(1) and 6033(a)(3)(A)(I) or (iii) of the Internal Revenue Code of 1986. 76 Fed.

Reg. 46,621, 46,626. But the final (and current) regulations reduced the definition to just

number (4) above; the first three requirements were discarded. *See* 45 C.F.R. § 147.131(a).

What that means is that the exemption applies to "churches, their integrated auxiliaries, and

conventions or associations of churches" and "the exclusively religious activities of any religious

order." 26 U.S.C. § 6033(a)(3)(A)(i) and (iii). The upshot of all this was that, as originally

drafted, employees covered under exempt organizations' health insurance as defined in the tax

code – *i.e.* church employees – could not receive cost-free contraceptive services. But the

"religious employer" exemption didn't apply to religious based non-profits like Notre Dame.

That was the balance originally struck by the drafters of the regulations.

        A tremendous outcry over this perceived disparity in the regulations ensued. Why would

churches be exempt but not church affiliated entities? So in 2012 the government said that it

would forego enforcement against non-profits with religious objections to contraception, like

Notre Dame, for a year while it considered developing an accommodation that would apply to

those entities. *See* 77 Fed. Reg. 8725, 8728-29 (Feb. 15, 2012).

        At this point, in mid-2012, Notre Dame filed a case on similar grounds to its current one.

But that case was dismissed without prejudice because Notre Dame lacked standing then, and the

case wasn't yet ripe. *See Univ. of Notre Dame v. Sebelius*, 2012 U.S. Dist. LEXIS 183267 (N.D.

Ind. Dec. 31, 2012).

        In July 2013 the government published the final regulations, which now include

accommodation for an "eligible organization," meaning an organization that "(1) [o]pposes

providing coverage for some or all . . . contraceptive services . . . on account of religious

objections; (2) is organized and operates as a nonprofit entity; (3) holds itself out as a religious organization; and (4) self-certifies that it satisfies the first three criteria." 78 Fed. Reg. 39,870, 39,874 (Jul. 2, 2013); *see also* 26 C.F.R. § 54.9815-2713A(a). When I refer to "the accommodation" in this Opinion, this is what I'm referring to. There is no dispute that this accommodation applies to Notre Dame. To take advantage of the accommodation, an organization need only complete an opt-out form (available at http://www.dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcertificationform.pdf) with the name of the organization and certifying individual and contact information, then sign and date it. The form need only be completed once, with a copy provided to any health insurer or third party administrator ("TPA") of the insurance plan.  *See* 78 Fed. Reg. 39,870, 39,875. The form lists the criteria for eligible organizations, and on the back it tells the TPA that the certifying eligible organization is opting out of covering contraceptive services and refers the TPA to relevant code sections outlining its obligations. *See* 78 Fed. Reg. 39,870, 39,879.

The explanation of the accommodation wouldn't be complete without discussing how contraceptive services are paid for. The employer and its health insurance plan don't pay a dime. Notre Dame self-insures its employee healthcare, Compl. ¶¶ 36-37, so I'll focus on the mechanics relevant to that setup. As far as Notre Dame's involvement, they fill out the form stating they are opposed to contraceptive services on religious grounds, and their work is done. At that point the ball is in the court of the TPA to pay for contraceptive services or arrange for payments through an insurer or other entity. Contraception costs are recouped by an insurance company that participates in a federally-run health insurance exchange – the insurer gets a fee adjustment. That money doesn't just cover the money paid out for contraception, but "include[s]

6

an allowance for administrative costs and margin." 78 Fed. Reg. 39,870, 39,880-81; *see also* 26 C.F.R. § 54.9815-2713A(b)(2); 45 C.F.R. § 156.50 (d). So to summarize: the TPA doesn't rely on the opted-out organization for any amount of money related to contraception – its contraception coverage, administrative costs, and even a profit margin are covered by the government-run healthcare marketplace.

The regulations say that eligible organizations may not interfere with the TPA's efforts to arrange contraception payments, nor seek to influence the TPA's decision to provide such payments. 78 Fed. Reg. 39,870, 39,879-80. However, the prohibited behavior evidently requires something more than expression of opinion, because its description is immediately followed by footnote 41: "Nothing in these final regulations prohibits an eligible organization from expressing its opposition to the use of contraceptives." *Id.* at 39,880 n.41.

The Seventh Circuit has not addressed the situation posed by this case. It addressed similar issues involving private employers' religious objections to the contraception requirements in *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013). However, that case, like many of the others making their way through courts around the country, *see, e.g.*, *Sebelius v. Hobby Lobby Stores, Inc.*, 723 F.3d 1114 (10th Cir. 2013), *cert. granted*, 82 U.S.L.W. 3328 (U.S. Nov. 26, 2013) (No. 13-354), has as its plaintiffs closely held corporations and their individual owners, so the accommodation doesn't apply to them.  The Seventh Circuit must have thought that difference to be important because early on in its opinion it discussed the religious exemption and accommodation at length, even though they were not at issue in that case.  I can only assume that they did it to show the contrast between how religious employers are treated under the regulations – they are given an accommodation – while for-profit employers with

conscientious religious objections are not. It is this distinction that *Korte* found to be "notabl[e]." *Korte*, 735 F.3d at 662.  More on *Korte* in a moment, but suffice it to say that Notre Dame is in an entirely different position than the plaintiffs in *Korte*.

### 3.    The Procedural Posture of this Case

Finally, before diving into the merits of the legal arguments, I would be remiss if I did not take a moment to discuss Notre Dame's litigation tactics in this case. The offending regulations were published in July 2013 and are set to go into effect on January 1, 2014. *See* 78 Fed. Reg. at 39,870 (Jul. 2, 2013). Yet Notre Dame chose to wait until December to file this lawsuit, although it certainly saw the case coming down the pike many months earlier.  It then waited another six days – until December 9 – to ask for a preliminary injunction. The government promptly responded and then Notre Dame filed its oversized reply brief on December 16, and a hearing on the motion was set for December 19.  Notre Dame told me they needed an answer on their request for an injunction within 24 hours of the hearing – meaning by today.  All of which raises a question of Notre Dame's own view of the injury it faces under the accommodation. Notre Dame certainly knew about the proposed regulations long ago, as evidenced by its premature filing of a case on the same basis as the current matter. *See Univ. of Notre Dame v. Sebelius*, 2012 U.S. Dist. LEXIS 183267 (N.D. Ind. Dec. 31, 2012).

Notre Dame tells me that the urgency is due to the TPA's internal deadlines to prepare coverage and contact beneficiaries. Affleck-Graves Affidavit ¶ 64; Suppl. Affleck-Graves Affidavit ¶ 14. It filed a supplemental declaration explaining its tardiness three days before oral argument, and four days before what the TPA says is its final deadline. *See* Suppl. Affleck-Graves Affidavit; Meritain Affidavit. The affidavit detailing excuses for the late filing of this

lawsuit are frankly a little hard to swallow. It states that Notre Dame needed over five months to analyze the final regulations and the accommodation. Suppl. Affleck-Graves Affidavit ¶¶ 6-9. Yet Exhibit D attached to Notre Dame's motion is a letter from the Office of the General Counsel of the United States Conference of Catholic Bishops, and is dated March 20, 2013.  The letter raises exactly the grounds of Notre Dame's complaint with respect to the accommodation for self-insured religious nonprofits, citing a description of the accommodation as proposed. *See* Plaintiff's Memo. ISO Preliminary Injunction, Ex. D. at 20-22.  Notre Dame also claims that it didn't get details on how its TPA would handle contraceptive coverage until December. Suppl. Affleck-Graves Affidavit ¶ 11. But it seems clear to me that Notre Dame could have certainly pressed its TPA sooner if it needed information. In sum, Notre Dame has in many ways created its own emergency, and I am left to wonder why.

In any event, and despite the time crunch, I have given full consideration to Notre Dame's motion. In doing so I have reviewed extensive briefing and exhibits from the parties, statutes and legislative records, voluminous regulations, and opinions addressing related issues from courts around the country.  As mentioned, I heard oral argument yesterday, December 19, 2013.  Finally, I received and have considered a brief filed by the American Civil Liberties Union as *amicus curiae*.[1]

## DISCUSSION

Notre Dame seeks a preliminary injunction claiming that its rights under the Constitution and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 *et seq* ("RFRA"), are being

---

[1] I also received late in the day yesterday a motion to intervene in this lawsuit filed by three Notre Dame students which largely supports the government's position but makes additional arguments as well. [Docket Entries ("DE") 33, 34]. Given the press of time, and since Notre Dame has not had an opportunity to respond to the arguments, I have not considered the motion to intervene.

violated. To prevail it must show "a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if preliminary relief is denied." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000) (citations omitted). If it meets that burden, I must then analyze the balance of equities, taking into account irreparable harm that would result to the nonmoving party and the consequences to nonparties. As the Seventh Circuit has stated: "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010). This is the "sliding scale" approach as some Seventh Circuit cases refer to it. *See e.g. Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

The first element, the likelihood of success on the merits, is the key inquiry in this case and is dispositive here on both the RFRA claim and the constitutional claims.[2]

### I. Notre Dame is not likely to succeed on the merits

The sincerity of Notre Dame's religious beliefs is of course essential to its religious freedom claims. While I am not permitted to question the centrality of a belief to a plaintiff's religion, I am permitted to consider the issue of sincerity. *Nelson v. Miller*, 570 F.3d 868, 878 n.7 (7th Cir. 2009) (citing *Koger v. Bryan*, 523 F.3d 789 (7th Cir. 2008) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005))). Notre Dame opposes contraception, and also opposes the funding, encouragement or facilitation of its use, or

---

[2] My jurisdiction to decide this matter is not in question. The contraception coverage requirement, the opt-out accommodation, and the penalties Notre Dame faces for noncompliance are an imminent potential injury which confers Article III standing. *Korte v. Sebelius*, 735 F.3d 654, 667 (7th Cir. 2013); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). Nor does the government challenge Notre Dame's standing to assert rights of speech and religious freedom, although Notre Dame is not a natural person. *Korte* forecloses those arguments, *see Korte*, 735 F.3d at 682, as well as any argument under the Anti-Injunction Act. *Id.* at 669.

being perceived as doing so. But whether opting out via the ACA accommodation constitutes a modification of behavior or qualifies as funding, encouraging, facilitating or endorsing the use of contraception are questions of fact and law, not of faith. With this thought in mind, I turn to the individual claims being pressed here by Notre Dame.

### A.      Religious Freedom Restoration Act

The Religious Freedom Restoration Act ("RFRA") is Congress's response to the Supreme Court's holding in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 883-90, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), "that the religious freedom guaranteed by the Free Exercise Clause of the First Amendment does not require religious exemptions from facially neutral laws of general applicability." *Korte*, 735 F.3d at 671. Under RFRA, the government may not substantially burden a person's exercise of religion, even if the rule in question is one of general applicability, unless the government shows that the rule "is in furtherance of a compelling governmental interest" and "is the least restrictive means of" doing so. *Id.* at 672 (quoting 42 U.S.C. § 2000bb-1). In RFRA claims, as in First Amendment claims, the preliminary injunction burdens track those borne at trial. *Id.* at 673. So the plaintiff must first show that his religious exercise is burdened substantially, then the burden shifts to the government to justify its actions under strict scrutiny. *See id.* at 673; *Daly v. Davis*, 2009 U.S. App. LEXIS 6222, at *5-6 (7th Cir. Mar. 25, 2009).

### 1.      Substantial Burden Inquiry

In any RFRA case, the starting point is the plaintiff offering proof that the government action in question actually substantially burdens religious exercise. *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003) [hereinafter "*CLUB*"].  What this

means is that the burden must really be *substantial*; a minimal burden won't suffice. *CLUB*, 342

F.3d at 761. To read RFRA otherwise would be to read the term "substantial" out of the statute.

To do so would mean that even the "slightest obstacle to religious exercise . . . —however minor

the burden it were to impose—could then constitute a burden sufficient to trigger" strict scrutiny.

*Id*.

The Seventh Circuit recently reiterated that the term "substantial burden" as used in

RFRA means to exert "substantial pressure on an adherent to *modify his behavior* and to violate

his beliefs." *Korte*, 735 F.3d at 682 (emphasis added and internal quotations omitted). The

language "substantial pressure on an adherent to modify his behavior" comes from the Supreme

Court in the pre-RFRA case of *Thomas v. Review Bd.*, 450 U.S. 707, 718, 101 S. Ct. 1425, 67 L.

Ed. 2d 624 (1981). *See also Nelson v. Miller*, 570 F.3d 868, 878, (7th Cir. 2009); *Koger v.

Bryan*, 523 F.3d 789, 799 (7th Cir. 2008).

So the inquiry focuses on whether the government is leaning on Notre Dame to modify

*Notre Dame's own actions*, not on whether government action is offending the plaintiff's

religious sensibilities. This much the Supreme Court has made clear: "A broad range of

government activities—from social welfare programs to foreign aid to conservation projects—

will always be considered essential to the spiritual well-being of some citizens, often on the basis

of sincerely held religious beliefs. Others will find the very same activities deeply offensive, and

perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their

religion. The First Amendment must apply to all citizens alike, and it can give to none of them a

veto over public programs that do not prohibit the free exercise of religion." *Lyng v. Nw. Indian

Cemetery Protective Ass'n*, 485 U.S. 439, 452, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988).

To break this down, if the government exerts pressure on the plaintiff to change his actions so as to violate his beliefs, I can't analyze the substantiality of the actions, or the centrality of the violated belief to his religion—it's the substantiality of the pressure that counts. But this skips over the threshold question of whether the government is actually requiring the plaintiff to modify his behavior so as to violate his beliefs.

So here's the question as I see it: under the ACA accommodation, is the government exerting substantial pressure on Notre Dame to change its own actions in a way that violates Notre Dame's sincerely held religious beliefs? Courts have used different language to try to define and describe "substantial burden," but it's such a fact-dependent question that I think the clearest way to approach it is to dive into other cases that have and haven't met the RFRA standard.

When I say "RFRA standard," I mean the "substantial burden" standard as it has been applied in cases brought under RFRA as well as under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Free Exercise Clause of the First Amendment to the Constitution. "When the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause, RFRA and RLUIPA." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008); *see also Korte*, 735 F.3d at 682-83; *CLUB*, 342 F.3d at 760-61; *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1071 n.13 (9th Cir. 2008) ("That *Lyng* was a Free Exercise Clause, not RFRA, challenge is of no material consequence. Congress expressly instructed the courts to look to pre-*Smith* Free Exercise Clause cases, which include *Lyng*, to interpret RFRA.")

To set the stage for comparison, I'll reiterate what Notre Dame claims is its substantial burden. In order to opt out of the contraceptive mandate, Notre Dame must complete a certification requesting the accommodation. Notre Dame claims that completing the form "authorizes" its TPA and the government to provide contraceptive coverage, the taint of which can be attributed to Notre Dame. Its critical to note at this point that if Notre Dame opts out of providing contraception, it will have *nothing to do with providing contraception*. It won't pay actual or administrative costs, and the TPA won't be looking to Notre Dame's fees to make a profit on the contraceptive program. Notre Dame obfuscates this point in its briefing, but as best I can tell by my review of the regulations, there is simply no financial burden on Notre Dame if it opts out.

Boiled to its essence, what Notre Dame essentially claims is that the government's action *after Notre Dame opts out*, in requiring the TPA to cover contraception, offends Notre Dame's religious sensibilities. And while I accept that the government's and TPA's actions do offend Notre Dame's religious views, it's not Notre Dame's prerogative to dictate what healthcare services third parties may provide. As Notre Dame admitted at the hearing, Notre Dame had already instructed its TPA in past years to not include contraception in its plan. If the preventive care requirements didn't exist, Notre Dame would continue to instruct its TPA not to cover contraception. And *even if* Notre Dame were completely exempt from the contraception requirement, it would have to certify to the TPA and the government that it is exempt to avoid being fined for noncompliance. In fact, there is no conceivable set of facts under which Notre Dame would not instruct its TPA not to include contraception on Notre Dame's plan. So Notre Dame isn't modifying its behavior in the least. The only thing that is modified, then, under the

14

accommodation, is that when Notre Dame tells the TPA not to provide contraception on Notre Dame's plan *the government and the TPA pay for contraception*.

In *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013), the Seventh Circuit found that the ACA—as applied to for-profit closely-held corporations and their owners—was coercive in threatening substantial fines for failure to modify their health insurance to cover contraception. The court focused on plaintiffs' choice—modifying their healthcare plans to pay for contraception for employees who wanted it and whose doctors prescribed it, versus paying stiff fines for balking.  The burden found to be substantial in *Korte* was the plaintiff "being forced to provide insurance coverage for these drugs and services in violation of their faith." *Id.* at 684-85. In other words, unlike this case, the government was coercing the plaintiff to change its health plan to cover and pay for something that it objected to on religious grounds.

Notre Dame seems to think that *Korte* is essentially dispositive of this case.  I fail to see why. *Korte* wasn't dealing with the ACA's religious exemption and accommodation in any way. Perhaps upon review of this case, *Korte* will be extended by the Seventh Circuit to say that the filing of a certification is an alteration in Notre Dame's behavior such that it constitutes a substantial burden under RFRA.  But contrary to Notre Dame's view of it, *Korte* certainly doesn't *compel* such a finding.  In my mind, this case differs greatly from *Korte* because the accommodation removes the coercion facing private for-profit companies by offering a different choice. As pointed out earlier, *Korte* itself recognized this important distinction when it stated that the lack of an exemption or accommodation for the for-profit plaintiffs was "notabl[e]," suggesting that the case might well have come out differently had the *Korte* plaintiffs had access to the accommodation now available to Notre Dame. *Id.* at 662.

15

The Supreme Court has held that the "government simply could not operate if it were required to satisfy every citizen's religious needs and desires." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988).  *Lyng* held that the federal government did not violate plaintiffs' free exercise of religion by building a road through plaintiffs' sacred areas.  In so holding the Court noted that the concept of religious freedom does not give one "a veto over public programs that do not prohibit the free exercise of religion." *Id.*  Similarly, Notre Dame need only step aside from contraception coverage, as it has always done and most assuredly would always do. By opting out it is not condoning or supporting the government's provision of access to contraception. But by refusing to formally opt out, Notre Dame would exercise a veto on the ACA's contraception requirement.

What's more, case law makes clear that a third party's objectionable use of a plaintiff's information doesn't make a viable RFRA claim.  The D.C. Circuit held in *Kaemmerling v. Lappin* that a prisoner could not state a claim under RFRA based on the federal government's extraction and storage of his DNA from samples he provided. 553 F.3d 669, 679 (D.C. Cir. 2008).  Plaintiff did not object to his provision of the tissue samples in itself, but to the government's actions afterwards in analyzing and storing the samples. Still, much the same as Notre Dame's argument in this case, the provision of the samples triggered the government's objectionable actions. The court pointed out that the objectionable course of action that occurs after plaintiff provided the sample "does not call for [plaintiff] to modify his religious behavior in any way—it involves no action or forbearance on his part, nor does it otherwise interfere with any religious act in which he engages. Although the government's activities . . . may offend [plaintiff's] religious beliefs, they cannot be said to hamper his religious exercise **because they**

**do not pressure him to modify his behavior** and to violate his beliefs." *Id.* (emphasis added, but internal quotation marks and citation omitted). Similarly, Notre Dame doesn't object to the content of the certification form. How could it? The certification says that Notre Dame *opposes* contraception on religious grounds. Notre Dame's objection is to the consequence of the certification and what third parties do with it down the line.

The *Kaemmerling* opinion discussed its similarity to one of the bases for the *Lyng* decision, *Bowen v. Roy*, 476 U.S. 693, 106 S. Ct. 2147, 90 L. Ed. 2d 735 (1986), "where the Supreme Court held that the state's use of a Native American child's Social Security number in determining eligibility for federal welfare benefit programs did not impair her parents' freedom to exercise their religious beliefs, a tenet of which was that use of the number beyond her control would 'rob [her] spirit.'" *Kaemmerling*, 553 F.3d at 680. The state's administrative use of Social Security numbers did not restrict plaintiffs' beliefs or actions. This opinion was pre-RFRA, but as noted above, the substantial burden standard is the same.  The Court's language makes it clear that the government's generally applicable administrative tools do not pose a substantial burden on plaintiff's religious exercise. "[Plaintiff] may no more prevail on his religious objection to the Government's use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government's filing cabinets. The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Bowen v. Roy*, 476 U.S. 693, 700, 106 S. Ct. 2147, 90 L. Ed. 2d 735 (1986).

The self-certification form is just such an administrative tool, used to relieve Notre Dame of liability for not providing contraceptive payments. It tells the government and the TPA that

Notre Dame is opting out, and it certifies that Notre Dame is eligible to do so.  In sum, the certification merely denotes Notre Dame's refusal to provide contraceptive care – a statement that is entirely consistent with what Notre Dame has told its TPA in the past.

Also instructive is the Ninth Circuit's en banc examination of the substantial burden showing in *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008) (en banc), *cert. den'd*, 556 U.S. 1281, 129 S. Ct. 2763 (2009). It confirms that *Roy* and *Lyng* are relevant to the substantial burden analysis in the RFRA era. Plaintiff American Indians objected to the blowing of artificial snow made from recycled wastewater onto a part of a ski mountain that was also a sacred place in plaintiffs' religion. The Ninth Circuit upheld the district court's finding that the government's actions were not a substantial burden to religion under RFRA. The use of recycled wastewater did "not force the Plaintiffs to choose between following the tenets of their religion and receiving a governmental benefit," nor did it "coerce the Plaintiffs to act contrary to their religion." *Id.* "The only effect of the proposed upgrades is on the Plaintiffs' subjective, emotional religious experience. That is, the presence of recycled wastewater on the Peaks is offensive to the Plaintiffs' religious sensibilities. . . . [U]nder Supreme Court precedent, the diminishment of spiritual fulfillment—serious though it may be—is not a 'substantial burden' on the free exercise of religion." *Id.*

Similarly, while Notre Dame may disagree with the actions of the government and other third parties, its own actions and speech are not required under the ACA to change in a manner contrary to its sincerely held religious beliefs. Notre Dame may be unhappy with the outcome of opting out, and find that action less spiritually fulfilling than it would otherwise, but it is not being required to modify its own behavior.

18

Nothing in the body of cases involving prisoner meal requests based on religious beliefs commands a different result.  Indeed, they counsel against issuing an injunction.  This is because, like this case, those cases turn on whether the plaintiff is being forced to modify his behavior or risk violating his sincerely held religious beliefs.  For example, in *Nelson v. Miller*, 570 F.3d 868 (7th Cir. 2009), a prison refused to provide the plaintiff a non-meat diet during Lent.  In trying to comply with his religious convictions, the plaintiff "lost so much weight that he had to be hospitalized." *Id.* at 880.  This coerced modification of behavior was a substantial burden. The same was true in *Koger v. Bryan*, 523 F.3d 789 (7th Cir. 2008), where the court held that the government imposes a substantial burden on an inmate when it puts pressure him to "'modify his behavior and violate his beliefs.'" *Id.* at 799 (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981)).  In other words, it violates RLUIPA to give a prisoner the Hobson's choice of either starving himself or observing his religion.  *See also Love v. Reed*, 216 F.3d 682, 689-90 (8th Cir. 2000) (prison's failure to accommodate religious diet substantially burdens a plaintiff; fasting is not an option); *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 814-15 (8th Cir. 2008) (no substantial burden where prisoner could purchase halal [food prepared per Muslim law] vegetarian food on meat days and request other accommodations to avoid contamination of vegetarian food by meat).

As far as I know, only three courts have reached the merits of the contraception opt-out. One has upheld the accommodation. *See Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 1:13-cv-1261-EGS (D.D.C. Dec. 19, 2013). Two others have struck it down. *See Roman Catholic Archdiocese of New York v. Sebelius*, No. 12 Civ. 2542, 2013 U.S. Dist. LEXIS

176432 (E.D.N.Y. Dec. 13, 2013) [hereinafter "*RCANY*"]; *Zubik v. Sebelius*, Nos. 13-cv-1459, 13-cv-0303, 2013 U.S. Dist. LEXIS 165922 (W.D. Pa. Nov. 21, 2013).

In *Priests for Life*, decided just yesterday, the court held—similar to this case—that the accommodations "simply do not require Plaintiffs to modify their religious behavior." No. 1:13-cv-01261-EGS, slip op. at 24. Instead, it "is entirely the activity of a third party" to provide the offending services, "and Priests for Life plays no role in that activity." *Id.* at 24-25.  For that reason, the court held that there was no substantial burden being placed on the plaintiff, and so the court dismissed the RFRA claim.[3]

The *RCANY* opinion relies on the same body of case law that I do, but in my view misses a few key points. First, some necessary background: *RCANY* involves several plaintiffs, some which are "religious employers" wholly exempt from the contraception requirement and some of which are non-exempt organizations eligible for the accommodation. *See RCANY*, 2013 U.S. Dist. LEXIS 176432, at *2, 15-16. In some cases the two types of organizations are affiliated, and share a healthcare plan, but nonetheless the non-exempt organizations would be required to self-certify under the accommodation. *Id.* at *48-49.  *RCANY* granted summary judgment and an injunction for the non-exempt plaintiffs based on RFRA, but not for the exempt plaintiffs. *See id.* at *3-4, 63-64.  *RCANY* noted that the plaintiffs in that case believe that the very act of completing the opt-out form "authorizes" third parties to provide the services to which plaintiffs object. *Id.* at *21-22. The *RCANY* court agrees with my view that it is the compulsion to *act*

---

[3]The government filed the *Priests for Life* opinion as supplemental authority. (DE 28.) Notre Dame responded, attempting to distinguish *Priests for Life* on the basis that the opinion noted that plaintiffs "have no religious objection to filling out the self-certification." (DE 32 at 1 (quoting *Priests for Life*, slip op. at 3-4).) Notre Dame argues that it has a religious objection to filling out the form itself. This is a distinction without a difference. As I've said, Notre Dame hasn't, and can't, object to the *content* of the form, it's only the effect of opting out that Notre Dame objects to, which it ties to the form. The *Priests for Life* plaintiffs argued, as Notre Dame does, that the contraception requirements and accommodation have "no logical or moral distinction." *Priests for Life*, No. 1:13-cv-01261-EGS, slip op. at 9. The opinion noted that form of argument, and rejects it, as I do, because it "cast[s] as a factual allegation" "the legal conclusion . . . that [] religious exercise is substantially burdened." *Id.* at 24 n.5.

contrary to religious beliefs that creates a substantial burden. *Id.* at *35-36, 46-47. But *RCANY* sees the government as compelling plaintiffs to act *by opting out*, in completing the self-certification. The *RCANY* court isn't persuaded by the fact that plaintiffs would instruct, and have in the past instructed, their TPAs not to cover contraception even without the ACA because "the self-certification would still transform a voluntary act that plaintiffs believe to be consistent with their religious beliefs into a compelled act that they believe forbidden." *Id.* at *46.

But as I see it, the act isn't changing, it's the consequence of the act that is.  In other words, it's not the self-certification form that "transforms" Notre Dame's action into one it objects to. Instead, it's what the government and the TPA do, and Notre Dame can't exercise its RFRA rights to control the actions of others. Notre Dame isn't being required to do anything new or different – its action is the same, although, granted, the result is different due to the actions of the TPA and the government. As I've said, Notre Dame may find the act of opting out less spiritually fulfilling now, but that doesn't make it a new action.

There is also something perplexing in *RCANY*.  The court agreed with the non-exempt plaintiffs that their opt-out through the self-certification form is compelled because plaintiffs object to what will happen as a result.  But that logic falls apart when the court moves on to the exempt plaintiffs' claim. They say their RFRA rights would be substantially burdened by pressure to separate the health care plans for exempt and non-exempt organizations because doing so would result in the non-exempt organization self-certifying, which in turn would result in the provision of contraceptive coverage. Without much explanation the court dismisses that argument:

> [T]heir claim is that expelling the non-exempt organizations could
> force those affiliates to provide coverage or self-certify, which in

21

> turn could mean that the [exempt] Diocesan plaintiffs' prior act of expulsion facilitated the provision of contraception. **This religious objection — which is not to the act itself, but instead is entirely dependent on the conduct of third parties occurring after that act —** is quite similar to the claim rejected in *Kaemmerling*. 553 F.3d at 678. The [exempt] Diocesan plaintiffs have **therefore failed to demonstrate that the [contraception requirement] Mandate imposes a substantial burden on their religious exercise,** and defendants are entitled to summary judgment on the [exempt] Diocesan plaintiffs' RFRA claims.

*Id.* at *49-50 (emphasis added).

The upshot of all of this is that *RCANY* essentially says that somehow adding another degree of separation results in the alleviation of the substantial burden. I fail to see the logic in this. What *RCANY* says about the exempt plaintiffs' claims applies with equal force to a non-exempt plaintiff's claim, as well, and as I noted previously, I agree that the claims are similar to that in *Kaemmerling*.

The *Zubik* court, too, accepts plaintiffs' characterization of opting out via the self-certification form as "facilitate[ing]/initiat[ing] the provision of contraceptive products, services and counseling." *Zubik*, 2013 U.S. Dist. LEXIS 165922, at *80. When cast in that light, finding a substantial burden is assured. But as I've said, while I accept that facilitating contraception is sincerely odious to the plaintiff entities in these cases, I don't have to accept without analysis that opting out of providing contraception is a modification of behavior. The *Zubik* court even says that it's not plaintiffs' action that has changed, but the result, through the actions of third parties: "In all prior instances where the Government, an insurer, or a TPA has requested employee names or other information from Plaintiffs, the reason the information was sought was of no moment to Plaintiffs. Now, under the 'accommodation,' the reason the documentation is required is so that contraceptive products, services, and counseling can be provided in direct

contravention of Plaintiffs' sincerely-held religious beliefs." *Id.* at \*82. Under *Zubik*, religious nonprofits get to veto third party action when it reduces the nonprofits' spiritual satisfaction in a particular action.

To the extent that Notre Dame claims a burden imposed by having to find a TPA that will cover contraception and enter a contract with that third party, the argument lacks factual support. Notre Dame's existing TPA is covering contraception. Notre Dame didn't have to search for a new TPA, or enter a new contract with the accommodation in mind. There's no indication that any TPAs in similar cases are refusing to pay for contraception.  In fact, Notre Dame's argument is belied by the actions of its own TPA.   It is the TPA's deadline to send out the appropriate paperwork that Notre Dame claims sets the December 20 deadline for this preliminary injunction decision, rather than the law's January 1, 2014 compliance deadline. *See* Meritain Affidavit ¶ 4; Suppl. Affleck-Graves Affidavit ¶ 64; *see also RCANY*, 2013 U.S. Dist. LEXIS 176432, at \*40-41 (calling this argument "somewhat speculative" but not issuing a holding on it because the self-certification ruling rendered it moot).

Notre Dame also throws in an argument about the government's cost-neutrality assumption. Memo. ISO Motion for Preliminary Injunction at 24-25. This is irrelevant to Notre Dame's position, because Notre Dame bears *none* of the cost under the accommodation – not for the contraceptive care, the administration of that service, or providing the profit margin. Notre Dame seems to be suggesting, disingenuously if it has reviewed the regulations on funding for TPA-provided contraceptive services, that the government's position is that the provision of contraception will just pay for itself on the individual TPA's balance sheet. The government

23

makes no such claim. The services will be paid for out of the federal insurance exchange, by discounting the monthly fees insurers pay to participate in the exchange.

The final issue raised by Notre Dame relates to the effect of the contraception requirements on their on-campus pharmacy. They do this by including a single, nearly identical paragraph in their Complaint (¶ 76), Affleck-Graves Affidavit (¶ 53) and Memorandum in Support of Motion for Preliminary Injunction (at 25). Notre Dame claims that it pays up front for prescriptions dispensed from its on-campus pharmacy, which is run by Walgreens, and later gets reimbursed by appropriate third parties. Notre Dame then claims that, under the contraception requirement, it would have to pay for contraceptive products dispensed from its on-campus pharmacy, and then get reimbursed later thus forcing it to "float" the cost.  Missing in all this is any allegation that Notre Dame's pharmacy even sells contraception.  Notre Dame offered nothing to suggest that the contraception requirement will force them to carry contraception on campus.  And the government confirmed during oral argument that the ACA doesn't require pharmacies to carry contraception. Notre Dame's confused and unsupported argument doesn't come close to meeting the plaintiff's burden in seeking a preliminary injunction.

To sum up: In my view, Notre Dame isn't being compelled to do anything it hasn't done before and won't do in the future regardless of the outcome of this case, but it still seeks to enjoin third parties from acting in a way Notre Dame finds objectionable.  In other words, it isn't being asked to "modify its behavior." *Korte v. Sebelius*, 735 F.3d 654, 682 (7th Cir. 2013).  But Notre Dame can't be compelled to do something it would do anyway, like instruct its TPA not to cover contraception on Notre Dame's plan.  To be clear, my holding isn't that a compelled action is *de minimis.* It's that no action is being compelled at all because the action would be taken even

24

if no contraception requirement applied. And if there's no compelled action that violates Notre

Dame's religious beliefs, then there's no substantial burden.

### 2.        Strict Scrutiny

Because I've held that Notre Dame is not likely to succeed in showing that the ACA with

accommodation imposes a substantial burden on its religious exercise, the RFRA claim is

unlikely to succeed. An exception to the substantial burden prohibition isn't necessary, so I don't

need to reach an analysis of whether the law furthers a compelling government interest and is the

least restrictive means the government could use. *See Korte v. Sebelius*, 735 F.3d 654, 672 (7th

Cir. 2013).

### B.        The Free Exercise Claim

The First Amendment provides that Congress shall make no law "prohibiting the free

exercise" of religion. "The Free Exercise Clause absolutely protects the freedom to believe and

profess whatever religious doctrine one desires. It also provides considerable, though not

absolute, protection for the ability to practice (through the performance or non-performance of

certain actions) one's religion." *United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 629

(7th Cir. 2000) (citations omitted). In interpreting the Free Exercise Clause, the Supreme Court

has made it clear that their "cases establish the general proposition that a law that is neutral and

of general applicability need not be justified by a compelling governmental interest even if the

law has the incidental effect of burdening a particular religious practice. Neutrality and general

applicability are interrelated . . . ." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508

U.S. 520, 531, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993) (citations omitted).  But general

applicability, for Free Exercise purposes, "does not mean absolute universality." *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008).

A law is not neutral under Free Exercise analysis if its object "is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. 520, 533. Put another way, "inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.* at 542-43.The analysis need not end with the text of the statute; the court is permitted to look for evidence of non-neutrality. *Id.* at 533-34.

Congress enacted RFRA specifically to be more restrictive on government action than the Free Exercise Clause. So failure under RFRA means failure under the Free Exercise Clause. *See e.g.*, *Indianapolis Baptist Temple*, 224 F.3d at 629; *Fernandez v. Mukasey*, 520 F.3d 965, 966 n.1 (9th Cir. 2008) ("Petitioners' failure to demonstrate a substantial burden under RFRA necessarily means that they have failed to establish a violation of the Free Exercise Clause, as RFRA's prohibition on statutes that burden religion is stricter than that contained in the Free Exercise Clause."); *see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424, 126 S. Ct. 1211, 163 L. Ed. 2d 1017 (2006) ("In *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), this Court held that the Free Exercise Clause of the First Amendment does not prohibit governments from burdening religious practices through generally applicable laws. . . . [We] held that the Constitution does not require judges to engage in a case-by-case assessment of the religious burdens imposed by facially constitutional laws. *Id.*, at 883-890, 110 S. Ct. 1595, 108 L. Ed. 2d 876. Congress responded by enacting the Religious Freedom Restoration Act of 1993 (RFRA)").

Notre Dame posits generally that both the contraception requirement and the accommodation that lets Notre Dame opt out violate its Free Exercise rights. I disagree with both theories. With respect to the requirement itself, the opt-out removes any burden the requirement may impose by allowing Notre Dame to refuse to provide contraception as it's always done. That solution would be inadequate if the accommodation were itself a burden, but as I held with respect to RFRA, it's not. Because RFRA has the stricter standard, I need not further examine the burden of the accommodation here.

More specifically, Notre Dame makes three arguments: *First,* it claims that the requirement isn't neutral because, essentially, most healthcare plans already cover contraception and adding it to the others wouldn't cost anything, so the only reason a plan wouldn't cover contraception is due to religious objection. Memo. ISO Motion for Preliminary Injunction at 37. *Second,* Notre Dame argues that the contraception requirement isn't generally applicable because the ACA provides exemptions, but not to religious nonprofits. *Id.* at 36-37. *Third*, Notre Dame claims that, with respect to the requirement, Free Exercise serves to reinforce other Constitutional protections, "implicat[ing] the 'hybrid' rights of religious believers." *Id.* at 37. This last argument seems to be that education is a part of the Catholic religion, and the requirement makes it impossible for Notre Dame to run an educational institution without being involved with contraception. This pressure on religious belief in turn puts pressure on Notre Dame to consider not running an educational institution, which violates its rights to freedom of association and speech. *Id.* at 37-38. I will take up each of these arguments in turn.

Notre Dame first claims, supported only by inference, is that the contraceptive requirement is aimed at religious objectors, and so is not neutral in application. But frankly there

27

is nothing to support this inference. And all of the evidence is decidedly to contrary. First, while Notre Dame takes issue with the contraceptive requirements, which may be widely covered already and cost-neutral to add where they're not covered, I note that the women's preventive health care requirements include many services completely unrelated to contraception, many of which Notre Dame does not appear to contest. *See* Inst. of Med., Committee on Preventive Services for Women, CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS (2011), available at http://www.nap.edu/catalog.php?record_id=13181. Apart from women's preventive healthcare, the broader section of the ACA on "Coverage of Preventive Health Services" also requires free coverage of immunizations and breast cancer screenings. *See* ACA § 2713. As discussed previously, the ACA is meant to be a comprehensive overhaul of the nation's healthcare system, so it isn't surprising that it lays out many types of coverage that must be included in health insurance; it would be surprising if it didn't. Describing what coverage healthcare plans should include seems reasonable, given all of the other changes set out in the ACA. For example, everyone must henceforth have health insurance. Large employers must provide it and smaller employers need not, but individuals are required to get it if their employer doesn't offer it. *See* ACA §§ 1501 (requirement on individuals), 1511 (requirement on employers). If the ACA didn't lay out a battery of services that must be covered, insurers could offer cut-rate plans that cover almost nothing to individuals buying insurance only to meet the requirement on individuals. The fact that contraceptive services are included among a bevy of other services that must be offered is not evidence that the government is targeting those who object to contraception on religious grounds. On the contrary, the comprehensive approach to women's health issues laid out in the ACA proves the precise opposite.

28

The laws and regulations in question, as well as the legislative history, further show that the ACA and related regulations were enacted for reasons neutral to religion. The Congressional record indicates that the purpose of the women's preventive healthcare requirements were not related to religion.  As articulated by its sponsor, the purpose of the women's health requirements is to "guarantee[] women access to lifesaving preventive services and screenings," and remedying gender discrimination in health insurance and the fact that "[w]omen are more likely than men to neglect care or treatment because of cost." 155 CONG. REC. S11985, S11986 (daily ed. Nov. 30, 2009) (statement of Sen. Mikulski). "Often those things unique to women have not been included in health care reform. Today we guarantee it and we assure it and we make it affordable by dealing with copayments and deductibles." *Id.* at S11988.

What's more, the relevant regulations were enacted based on the expert recommendations of the Institute of Medicine ("IOM"), without religious motive. Inst. of Med., Committee on Preventive Services for Women, CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS, 2 (2011), *available at* http://www.nap.edu/catalog.php?record_id=13181. The IOM "was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The [IOM] acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government . . . ." *Id.* at iv. The IOM recommended that the guidelines include support and counseling addressing a battery of issues including, of primary relevance here, "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." *Id.* at 10.  It is therefore abundantly clear

that the women's health requirements in the ACA are entirely neutral and not intended to target religion.

Notre Dame next argues that the contraception requirement isn't generally applicable because there are secular exemptions, specifically, rules applying to small businesses and to grandfathered plans. But as the *Priests for Life* court noted, "[t]he existence of categorical exemptions does not mean that the law does not apply generally." *Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 1:13-cv-01261-EGS (D.D.C. Dec. 19, 2013), slip op. at 34. The Supreme Court made that point in *United States v. Lee*, 455 U.S. 252, 260-61, 102 S. Ct. 1051, 71 L. Ed. 2d 127 (1982), when it held that the social security tax requirements are generally applicable despite the fact that the system contains categorical exemptions. The categories that the ACA creates and of which Notre Dame complains are objectively delineated, without reference to religion. They do not make the law not neutral.

Notre Dame's final argument – its "hybrid" claim – all depends on its Free Exercise argument, which I've explained doesn't hold water. The accommodation doesn't implicate Notre Dame's religious exercise, so there's no resulting pressure on Notre Dame's Free Speech and Free Association rights to operate its university. None of Notre Dame's constitutional claims are likely to succeed. And because of this Notre Dame can't reasonably argue that, although none of its Constitutional rights is violated individually, the fact that it alleges more than one violation somehow leads to a viable claim. Such a theory has been widely discredited, and for good reason. Two losing claims don't equal a winning one. *See Mahoney v. District of Columbia*, 662 F. Supp. 2d 74, 95 n.12 (D.D.C. 2009); *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001) ("For this argument to prevail, one would have to conclude that although the regulation

does not violate the Free Exercise Clause, and although they have no viable First Amendment claim against the regulation, the combination of two untenable claims equals a tenable one. But in law as in mathematics zero plus zero equals zero." (citations omitted.)).

Based on the foregoing, I find that Notre Dame is unlikely to succeed on its Free Exercise claim.

### C.    The Establishment Clause Claim

The Constitution's First Amendment says that Congress can "make no law respecting an establishment of religion." "The Establishment Clause prohibits government sponsorship of, financial support for, and active involvement in religious activities." *United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 630 (7th Cir. 2000). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244, 102 S. Ct. 1673, 72 L. Ed. 2d 33 (1982).  Under the "Lemon Test," the law in question has to have a secular legislative purpose, the primary purpose must neither advance nor inhibit religion, and the government must avoid excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971); *see also Indianapolis Baptist Temple*, 224 F.3d at 630. This doesn't mean that government has to cross the street when it sees religion coming; indeed, complete avoidance of religion is often not possible.  "The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited." *Walz v. Tax Com. of New York*, 397 U.S. 664, 669, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970).

Specifically, "the Supreme Court has held that the sorts of generally applicable administrative and record keeping requirements imposed by tax laws may be imposed on religious organizations without violating the Establishment Clause. The normal incidents of collecting federal employment taxes simply do not involve the intrusive government participation in, supervision of, or inquiry into religious affairs that is necessary to find excessive entanglement." *Indianapolis Baptist Temple*, 224 F.3d at 631 (collecting cases regarding state sales and use tax, federal income tax, workers' compensation program and social security tax).

In *Walz*, a real estate owner "sought an injunction in the New York courts to prevent the New York City Tax Commission from granting property tax exemptions to religious organizations for religious properties *used solely for religious worship*." 397 U.S. at 666 (emphasis added). The tax exemption differentiated between religious organizations and the way they used their property. The Supreme Court found the exemption constitutional, holding the government "has not singled out one particular church or religious group . . . ." *Id.* at 673. The exemption also applied to certain secular properties the government considered conducive to "moral or mental improvement," and still the exemption of only certain religious properties was constitutional. *Id.* at 672-73.

Notre Dame argues that this case is governed by *Larson*, but I fail to see why. Reply ISO Motion for Preliminary Injunction at 21. In *Larson*, the Supreme Court found that a Minnesota law that specifically targeted less established churches was unconstitutional under *Lemon*. 456 U.S. at 254-55. But that is not at all what the ACA does. It doesn't favor one religion over another by creating exemptions for certain categories of employers and accommodations for others.

32

Moreover, limited religious exemptions from generally applicable laws can take into account considerations beyond the content of one's religious beliefs. In *Droz v. Comm'r*, plaintiff objected to a law exempting from social security taxes members of organized religions that objected to social security taxes on religious grounds *and* that would provide for members who needed assistance. 48 F.3d 1120, 1124-25 (9th Cir. 1995). Plaintiff argued that his beliefs could mirror those of an exempt person, but he would still have to pay into social security because he wasn't a member of an eligible sect. *Id.* at 1124. The court found the law constitutional. It declined to apply strict scrutiny because the law did not discriminate among religions and applied a condition that had a secular purpose and did not advance or inhibit religion. *Id.* at 1124-25.

Notre Dame alleges violation of the Establishment Clause by the grant of an exemption only to a particular category of "religious employers," and because identifying what groups are in that category will excessively entangle the government with religion. Memo. ISO Motion for Preliminary Injunction at 40. Notre Dame does not claim that the ACA discriminates among faiths, but among institutions of the same faith that have different organizational structures. Nor does Notre Dame argue here that the law does not have a secular legislative purpose, or that it advances or inhibits religion. Nor could it. As I addressed above, the law has a secular purpose, and the purpose does not involve advancing or inhibiting religion.

So my application of the *Lemon* test comes down to whether there is excessive entanglement. While Notre Dame is unhappy with the distinction the law draws, I think the argument that the distinction can't be drawn without excessive government entanglement rings hollow.  An organization is exempt if it's "organized and operates as a nonprofit entity and is

referred to in sections 6033(a)(1) and 6033(a)(3)(A)(I) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a).  The distinction is based on the tax code, and the Supreme Court has upheld federal tax laws applied neutrally to religious and secular entities alike. In this case, Notre Dame had no problem determining that it's not exempt, and there is no suggestion that the government was involved in that determination. Compl. ¶ 43. Furthermore, an ACA determination based on corporate organization and tax code is surely less entangling than the one the court found constitutional in *Droz* based on membership in a religious group and specific tenets of that group's faith.

Notre Dame is therefore unlikely to be able to demonstrate that the ACA and the contraception opt-out violate its rights under the Establishment Clause.

### D.    The Free Speech Claim

The concept of freedom of speech includes the right to be free from Congress telling people what they must say.  *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006) [hereinafter "*FAIR*"] ("Some of this Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say."); *Hill v. Colo.*, 530 U.S. 703, 714-15, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000).  However, to violate the right to free speech, naturally a law must actually regulate speech. Even when a law conditioned federal funding on schools allowing military recruiters on campus, there was no free speech violation because letting the recruiters on campus didn't mean that the schools were voicing their support for the recruiters' message. The law in question was constitutional because it "neither limits what law schools may say nor requires them to say anything. Law schools remain free under the

statute to express whatever views they may have . . . ." *FAIR*, 547 U.S. at 60 (citation omitted).

Notre Dame alleges two separate free speech violations: *first*, that the government compels it to speak contrary to its beliefs, and *second*, that the regulations contain a "gag order" prohibiting Notre Dame from speaking as it wishes. Reply ISO Motion for Preliminary Injunction at 18-20. Neither argument is persuasive.

Notre Dame claims that the accommodation compels speech by requiring Notre Dame to facilitate contraception and counseling that may support contraception, and by requiring the completion of the certification form. I've explained at length my view that the government isn't forcing Notre Dame to do *or say* anything it wouldn't do or say otherwise. Long before the ACA Notre Dame told its TPA not to cover contraception, and it will continue to do so with or without the ACA. It can't be called compulsion for Notre Dame to do what it has done, does, and will do anyway.

Furthermore, as the government points out, not a single court has upheld a Free Speech challenge to the contraceptive-coverage regulations because most recognize that the certification requirement regulates conduct, not speech. Opp. to Preliminary Injunction at 20 (citing, e.g., *MK Chambers Co. v. U.S. Dep't of Health & Human Servs.*, No. 13-cv-11379, 2013 WL 1340719, at *6 (E.D. Mich. Apr. 3, 2013); *Conestoga Wood Specialities Corp. v. Sebelius*, 917 F. Supp. 2d 394, 418 (E.D. Pa. 2013)).

With respect to whether the ACA imposes a gag order on speech, Notre Dame points to the prohibition against "directly or indirectly, seek[ing] to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third

party administrator's decision to make any such arrangements." 26 C.F.R. 54.9815-

2713A(b)(iii). Notre Dame does not include in its brief the text that immediately follows this

prohibition in the final reporting of the rules, which states "[n]othing in these final regulations

prohibits an eligible organization from expressing its opposition to the use of contraceptives." 78

Fed. Reg. 39,870, 39,880 n.41.

The text accompanying the final rules could not be clearer that Notre Dame is free to

speak all it wants. The prohibition on influencing the TPA must involve something more than

expressing Notre Dame's views.  As the government put it, the regulations don't prohibit speech,

but instead prevents "an employer's improper attempt to interfere with its employees' ability to

obtain contraceptive coverage from a third party by, for example, threatening the TPA with a

termination of its relationship because of the TPA's" coverage of contraception. Opp. to

Preliminary Injunction at 22.  Prohibiting this type of behavior is just as permissible as

prohibiting an employer from threatening employees regarding unionization, which is speech

that falls clearly outside the protection of the First Amendment. *See NLRB v. Gissel Packing Co*.,

395 U.S. 575, 618, 89 S. Ct. 1918, 23 L. Ed. 2d 547 (1969).

In sum, because the regulations do not force Notre Dame to say anything, nor do they

prevent Notre Dame from forthrightly expressing its views regarding the topic of contraception,

Notre Dame's free speech rights are not being infringed. Consequently, Notre Dame is unlikely

to succeed on its Free Speech claim.

## II.    Balancing the Equities

The Supreme Court has held that a "plaintiff seeking a preliminary injunction must

establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). These requirements appear to be conjunctive, requiring the party seeking injunction to show all of them. However, the Seventh Circuit's sliding scale analysis referenced earlier in this opinion requires me to consider and balance the harms to Notre Dame, the government, and the public unless I find that Notre Dame has less than a "negligible chance of success." *Lineback v. Spurlino Materials*, 546 F.3d 491, 502 (7th Cir. 2008); *Kiel v. City of Kenosha*, 236 F.3d 814, 815-16 (7th Cir. 2000).  This simply means that a greater harm can make up for a lesser likelihood of success. *See, e.g.*, *AM Gen. Corp. v. Daimlerchrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002); *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir. 1993).

As an aside, the government noted in its Opposition to Preliminary Injunction its objection to the sliding scale approach as inconsistent with the Supreme Court's holding in *Winter*. Opp. to Preliminary Injunction at 8 n.4.  But the government also recognizes that I am nonetheless bound to apply the sliding scale, although ultimately in this case I do not find that it slides my decision to a grant of the preliminary injunction.

An injunction is an extraordinary remedy not to be issued lightly. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. Thus, the Court has noted that '[t]he award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff,' and that 'where an injunction is asked which will adversely affect a public interest for whose impairment, even

temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.'" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13, 102 S. Ct. 1798 (1982) (citing *Yakus v. United States*, 321 U.S. 414, 440 (1944) (footnote omitted)).

As this opinion demonstrates, in my view of things Notre Dame has a low likelihood of success on the merits. Still, I can't say that it has *no chance*, particularly given the differing outcomes in other courts. Turning to interests and harms, Notre Dame and the government are basically in equipoise.[4] In my mind the low likelihood of success necessarily bears on the likelihood of irreparable injury – if it's unlikely there will ultimately be a showing of a violation of rights, then it's unlikely that there will be a violation while the case is pending.  I nonetheless fully recognize that if I am incorrect and Notre Dame should ultimately prevail, then certainly the violation of its religious rights in the interim is a substantial harm.  But the government also has strong interests in opposing the injunction. Congress has an interest in seeing a duly enacted law legislating its intent put into effect. And administrative agencies have an interest in enforcing carefully drafted regulations in their bailiwicks.  As for the public interest, it is equally split. The public – however one chooses to define that vague term – certainly has an interest in the vindication of First Amendment rights. But it also has an interest in the full enforcement of duly enacted laws. More specifically, the women who work for Notre Dame, as a subset of the public, also have a very real stake in receiving the health care that the ACA affords to them.[5]

---

[4]*Korte* touches on the government's interests when it addresses RFRA's strict scrutiny analysis, but there it focuses on whether the government's interest is compelling enough to meet strict scrutiny muster. The Seventh Circuit accepts as legitimate the government's interest in "broaden[ing] access to free contraception and sterilization so that women might acheive greater control over their reproductive health," although the court questions whether it is of "surpassing importance." *Korte v. Sebelius*, 735 F.3d 654, 686.

[5]I note again the pending motion to intervene in this case filed by three Notre Dame students. *See supra*, n.1. While I have not yet had an opportunity to fully consider the appropriateness of intervention here, the motion demonstrates that the interest of affected women is not hypothetical.

And finally, I can't ignore Notre Dame's waiting to file its case until mere weeks before the wheels of the requirements were going to start to turn. Had Notre Dame acted more expeditiously the harm that they now fear could have been avoided altogether.  That put the government and other interested third parties in the position of defending a case on the fly.  That would be fine if it was by necessity, but it wasn't here.  And the Seventh Circuit has noted that "[d]elay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will suffer irreparable harm if a preliminary injunction is not entered." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001).

So while the interests for and against injunction are very closely balanced, I find that the low likelihood of Notre Dame's success on the merits tips the sliding scale towards denial of the preliminary injunction that Notre Dame seeks.

## CONCLUSION

For the foregoing reasons, plaintiff University of Notre Dame's Motion for a Preliminary Injunction (DE 9) is **DENIED**.

**SO ORDERED**.

ENTERED: December 20, 2013

/s/ Philip P. Simon
**Philip P. Simon, Chief Judge**
**United States District Court**

39